Both sides. Good morning, Your Honors. My name is Diane Jennings, and I represent Northshore University Healthsystem. Appellee, step up. Thank you. Good morning, Justices. My name is Mark. It's M-A-R-C, Taxman, T-A-X-M-A-N. And I represent Melinda Berman as mother of the child, Sydney Berman, a minor. I can assure you that the Justices have read your briefs. We've looked at the pertinent portions of the record, so we're familiar with the case. You don't need to go into a lot of the facts. But there are several interesting facts in this case. So each side has 15 minutes, but we don't look at our watch in this division. But don't repeat yourself. So anytime you're ready, Ms. Jennings, we'll start. Thank you. Thank you, Your Honors. And you'll have some time for replying, Ms. Jennings. Since you're familiar with the case, I will just briefly point out, this is about an injury to a baby, a newborn. A cut on her hand. And the way it's been described is that the cut was at or just below the crease in the finger on the palm side where the knuckle is. Subsequent surgery, because they had to pull tendons up, the scar would go down into her palm. So this injury to a baby, obviously the baby can't do it herself. Obviously mom and dad didn't do it. It didn't happen in the womb. So it happened in the hospital. So the issue really for the jury to decide was, did it happen during the C-section because baby was delivered by C-section? Or did it happen sometime after with some instrument that came in contact with the baby during the two hours following her birth? There was no dispute if it happened afterwards, it's not going to happen without negligence. It was a definite res ipsa issue. On the other hand, if it happened during the C-section with the scalpel, then there was testimony that this is a complication, a terribly common one, maybe 1 to 2 percent. But a known complication of C-section deliveries is that the baby can get cut. And one of the doctors, Dr. Pensler, who repaired, initially repaired the finger, Sidney's finger, told us that he'd seen others, cuts like that from a C-section as deep or deeper, you know, could be on the face, could be any part of the body that's opposite the scalpel. More importantly though, if it occurs during the C-section, the hospital is essentially not going to be found liable, is that correct? Pardon me? The hospital is not going to be found liable if it occurs during the C-section, would that be right or no? It's not going to be found liable if the jury accepts the testimony that it can happen without negligence during the C-section. In other words, they might have had an expert who said that, yeah, that's a deep cut, you know, maybe it was negligence. So might have definitely had some testimony in that regard. In this case, there was a special interrogatory, which the jury said didn't happen during the C-section. So we know that at least that was much of their thinking. Evidence was pretty closely balanced, I would say, in this case. Each side had their own expert saying, you know, either I think it happened during the C-section or I think it didn't happen during the C-section. Dr. Simon, who was the resident who actually did the surgery, said, you know, more likely it happened during the C-section. Dr. Krauss, the attending, who was there during the surgery, said no way did it happen during the C-section. So we've got conflicting testimony for the jury, too, to have to sort out. Each side also had a piece of evidence that was, if you will, unique to them. For the defense, it was the two physicians who saw the cut after it was made. Dr. Kaplan, the neonatologist who was called in when the nurse discovered it, and Dr. Pensler, who did the initial repair surgery, he was called in, too, that same day. They both said this was a scalpel wound, that it could not have been made by scissors or it was definitely a scalpel wound. Now, of course, the only testimony we have of a baby ever coming in contact with a scalpel was during the C-section. There was no evidence that a scalpel was otherwise used on her. For plaintiffs, I think that their good piece, their key piece of evidence for them was a picture of baby, right at birth. And you can see her right hand. And her right hand is, her fingers are like this. And it's almost literally right out of the womb. And the question raises, well, if that tendon is cut in there, wouldn't her finger be sticking up? Could it be curved like this? So that was, they were using that as corroboration of the fact that, no, it didn't happen during the C-section. It happened sometime afterwards. So naturally, we're each going to attack each other's unique evidence. Plaintiff's form of attack took the form of an experiment. Dr. Krause came in, took the stand, and she had a pair of scissors. She said, these are scissors we use for various things in the labor delivery room. Well, she compared it to scissors that were in the photograph, right? Pardon? She compared the scissors to looking like the scissors that were in the photograph. Yeah, she said they're similar. It's got the same edge? I don't know. Is it sharpened the same way? We don't know. And she said, and Plaintiff's attorney says, oh, well, I happen to have a snack here. Here's a carrot. Let's see, you know, could you cut the carrot with those scissors? And she did so. Took the carrot and made three separate, at least three cuts in the carrot. And then she was asked, oh, well, how does that compare to this description of Sidney's? Oh, it looks very similar to the wound on Sidney's head, which she never saw. But it was described? It was described. In her brief. It was described. Going back, since we have not seen the carrot, when you have the scissors and you cut something hard, say a carrot or a pencil, you would have a cut on both sides, generally, would you not? And I take it in this case, of course, the baby only had a cut on one side of her finger. Right. She had, actually, it was not on the sides at all. It was on the. Right. So how did it, so going back, and these are just going back to the carrot, when the doctor cut the carrot in front of the jury, was there a cut, if you know, on both sides of the carrot? Do you know? Was the carrot cut on both sides when the doctor did this demonstration, or as you say, experiment, in front of the jury? Yes, it was. Okay. Well, that would cut to your advantage as well, would it not, normally? If there is a cut, you know, on the carrot on both sides, there is only one cut on one side. Right. So that is just a demonstration or. And also, because the carrot is firm, and we know certainly a baby's fingers, not even the bone. They are unlikely to come in with a baby's finger, though, and try and cut in front of the jury. It was more like a paper cut, would look, on the hand. So obviously it was our contention that this was not just demonstrative evidence. Demonstrative evidence is used as an aid to understanding the testimony of a witness. In this case, there were such demonstrative evidence things used. There was a chart put up showing the internal mechanisms of the finger, you know, where the tendons lie and so on, and why it is that. This was a pretty serious injury, because the tendons lie on top of each other. So if there are scar tissue forms, you can have more of a problem, because they don't move easily. That's demonstrative evidence. We take, it is our position that this went beyond demonstrative evidence. This was an experiment or test performed for the jury, without having shown that these were similar circumstances in key areas, namely, are these scissors what cut the baby? We don't even know that. Are these of the same, not just do they look similar, I mean, scissors were. Well, the issue is, could a scissors cause the injury that was inflicted on this baby? That's the issue. If the answer is yes, then you have to pay up. That's the issue. So, go ahead, though. Reach your, go ahead. You. Yes, the issue was, could the scissors have done this? Could the scissors have made the which obviously it could, and that certainly was not an issue in the case, but whether this cut was the same as the cut in Sidney's hand. Because the issue, what they were trying to refute was the testimony of the two doctors who actually saw the wound, who said it couldn't have been done with scissors. What we saw couldn't have been done with scissors, unless they were sharpened to a razor point and used in an orthodox fashion. In other words, using a blade of it. Not cutting, but using a blade like you would a razor blade. Counsel, let me ask you this question about the demonstration. Was the jury misled in any way? I'm sorry, Your Honor? Was the jury misled in any way when they put on this demonstration or experiment, as you call it? Yes, Your Honor, I think they were. Because Dr. Krauss was then asked, is this cut in this carrot similar to the cut in Sidney's hand? But what I'm asking you And she said, yes, it is. But what I'm asking you is, it's a carrot and some scissors. It's a very simple demonstration. I mean, the jury could arrive at their own conclusions. Well, but They couldn't be misled by what they were doing. Carrot and scissor. Either they were persuaded by it or they were not persuaded by it. Well, except, Your Honor, that the assumption is that a carrot is going to cut in the same way as the soft flesh of a baby's finger. But they could come to their own conclusions about that. Well, Your Honor, if you look at some of the cases we cited, in particular the Thomas case, what they said there was, the problem is, when you have conflicting testimony, you know, yes it is, no it isn't, it's so much easier for the jury to say, well, you know, we can see this. But in the Thomas case, they had a bus. They said this is the same bus that was involved in the accident, but never pointed out or suggested maybe it had been repaired or maybe some work had been done on it. So the jury was not provided with that information. This is a little different. Well, not necessarily, Your Honor, because they're told this is similar scissors, but they don't know if it's as sharp as the scissors that were used. They don't even know that it was scissors that caused this cut. But the issue on admission of evidence is abuse of discretion. And judges call these shots every, probably 20 times in a trial like this. We're only to overrule it if they abuse of discretion, meaning that no rational person would have allowed this to take place. Well, certainly it doesn't make it reversal proof, Your Honor. I mean, you can see that from the cases like Spurka and Thomas, that there are situations where it is so prejudicial, and I think it was in this case, because it was so well-balanced otherwise, and this was the key piece of evidence for the hospital, was the fact that this, that the doctors who actually saw this cut said it could not have been made by scissors. Well, I was on Spurka, and Spurka, one of the problems, again, is Thomas is different, Spurka is different. The major problem with Spurka was that the plaintiff's attorney didn't turn over the animation until three days into the trial. And that was real, real bad. And as an embolism case, which are very difficult to prove, and also difficult to defend, it's just a crapshoot of what's going to happen, since nobody can explain how this works. And so then they had this made-up animation thing, which disagreed with, their own expert said that animation is not what occurred. So, that was a pretty easy one, frankly, for us to say no to reversal. Can you move on, can you touch on any other evidentiary problems other than the scissors? I'm sorry, Your Honor? Can you discuss any other complaints about the evidentiary things rather than the scissors? Other than the scissors, yes. The other issue was the picture of baby Sidney with her hands like this. Dr. Light, who was a physician who did a second surgery on Sidney, she was about two and a half years old, they did a revision surgery to try and loosen up some of the scar tissue. And while he was, during his evidence deposition, he was shown this picture of Sidney and asked, doesn't this prove that this cut was not made during the C-section? Because otherwise how could her little finger be curved? And Dr. Light said no, it doesn't prove that. And he had two bases for that. He said, newborn, sometimes the fingers are kind of stuck together, I suppose with blood or fluids. He said, or if the incision was not all the way through the tendon, but only partially through the tendon, the finger would still curve. And that's consistent with the nurse in the nursery who first had the injury pointed out to her. She said that when she saw the baby, the fist was like that, or at least the fingers were curved down. She had to open them up to look and see what the source of the blood was. And it was after that, the baby's fingers, that middle finger would not go back down again. The plaintiff points out at page 14 of their brief, though, that there was not extensive questioning in this area. But both on direct, Dr. Light was allowed to testify that you could have a laceration which would lacerate the bone, but not completely cut the tendon. And then on cross, the hospital cleared it up that indeed, that you would have a cut of 80 or 90 percent of the tendon, and it would later snap upon extending the finger. And that was brought out in front of the jury. Well, no, Your Honor, the, I know plaintiff insisted that Yeah, we have your reply briefs in now that wasn't in front of the jury, but that shows you not how this works. I submitted the tape The DVD Yeah, of the testimony. I showed you what the ruling was of the court. It's not quite clear to me what more needs to be done to show you that that evidence was Well, if you're saying that page 14 is false, that what they put out at page 14 was never in front of the jury, that would be significant. But to say that other things were not in front of the jury on a long DVD, well, that is not significant because that's not how a public court works. We're not going to look at a DVD and say, well, let's start at the beginning. Oh, that should have gone in. Can you move on to remitter? Move on to remitter. So at this point now, we have to have I'd like you to move on to remitter. I don't want to hear any more about a DVD. I'm kind of a blind guy. Okay. Remitter is kind of a nebulous standard. I know that it's wishy-washy. It's, you know, does it shock the judicial conscience? And quite frankly, I don't know what would shock the judicial conscience anymore. Let me get right to the heart of it. You indicated in your brief that the plaintiff is entitled to fair and reasonable compensation. Fair and reasonable, yes. All right. What would be fair and reasonable compensation for the disfigurement to Sidney's writing in your opinion? Give us a figure. To give you a figure? Give us a figure. I think $750,000. $750,000. All right. What would be fair? I think that this is $2 million over the top. Now, wait. You're talking about total award. Total. I'm asking what would be reasonable and fair compensation for the disfigurement to her hand, just for the disfigurement. That's all I'm asking about. Just for the disfigurement? I would say that's probably the, well, no, because I think the pain and suffering, the disability. And then I'm going to ask you about pain and suffering. Tell me what's fair and reasonable for those two injuries to Sidney. I would give $250,000. Total for both? For each, because I think all of them contribute equally. Wait. For each? $250,000 for each? $250,000 apiece. For pain and suffering. $250,000 for the disfigurement. Pain and suffering. $250,000 for pain and suffering. Yeah. Okay. Okay. Now, obviously, a defense view of what's fair and reasonable, I think it, the jury's, at the closing argument, defense counsel suggested $250,000. The other hand, end of the scale, we had plaintiff's attorney asking them for, I think, $2.2 million, which is going to be at the high end of the scale, because that's how you argue a case. This jury gave half a million more than the highest figure asked. Neither side cites a case where this occurs, even though I'm told by my friends in law and jury this happens with some frequency, or a case takes a turn, or there's particularly sympathetic jurors, and they'll send out a note, like in the movie, The Verdict, may we pay more money? And the answer, of course, is yes. So that being so, then, nobody cites a case saying that that's a bad thing. Well, certainly not. But when you have two extremes, you say what's fair and reasonable, and you have, on the defense side, say $250,000, which is the low end of reasonable, the real low end of reasonable. And you have $2.2 million, which naturally is going to be at the really high end of reasonable. And you're not talking about, I think that $50,000 of that is accounted for with the medical expenses. Right, future medical expenses. Because, and I can see where they're coming from on those medical expenses. We knew that the initial surge of the medical state, $56,000. So again, you double that, $100,000, that's reasonable. But this nebulous pain and suffering and so on, I agree that there's got to be some point at which a court says, wait a minute, she has trouble holding a pen, that's worth a million dollars. Well, she's like a little girl. Someday, hopefully, she'll be going to the prime, and maybe, she's certainly, not to be a sexist, but little girls tend to me, in my experience, to look at themselves more than little boys do. So notably, they would be much more taken aback the fact that they have a scar on the middle of their palm than a boy. A boy probably shows everybody. Girls don't do that. And so I'd suggest disfigurement, as bad as it is to say, don't worry, there won't be an opinion, because I'll be thrown off the bench. But that's, in my experience, how this stuff works. Let's go back, though. A concern I have in all these cases is, so you say, well, $250,000 is too low, you concede that. And $2.2 million is too high, because it's just too high. Normally what happens, in my experience, is that the parties sit down with the judge before trial, and they decide what they think is reasonable. And the judges, frankly, don't like to do juries, in my experience. They want the parties to agree. And so, and again, this will not be, I'm not asking what the offer was, or what the, how far apart they were, because it doesn't matter. But at the end of the day, when the two parties decide they are not going to meet, they would rather 12 people, 12 strangers, of who knows what background, come in and decide for the plaintiff or for the defense, at how much a injury is worth, should we intercede then, and say, well, that was too high. That was your client's choice, and the plaintiff's choice. We want 12 people off the street to come in and tell us what this is worth. Well, that's a crapshoot. They're rolling the dice, that's what it's called. Why should we save you? Because there comes a point, I think, when common sense, reasonableness, and fairness demand that when a jury is out of control, when you've had them being told things like, or hearing things like, did you know, doctor, that the hospital destroyed the medical record? Evidence that had nothing to do with this case, because there were copies of the law, it was sustained, but the jury has heard this. When they're told that the hospital is, this is a made-up defense, they're all on the bandwagon, all putting their finger at poor Dr. Kraus, poor honest Dr. Kraus. Yes, when you're doing those kinds of things to whip a jury into a frenzy, and then saying, you made $2.2 million, what do you mean $2.2? We're giving you $2.75 million. And so this argument is that this, and we see it from the brief, you're relying primarily on the passion and prejudice of the jury based on evidentiary objections that were overruled or not overruled. Well, you can overrule an objection, but once the jury's heard, did you know that the evidence was destroyed? You can sustain that objection all you want, but they've now heard, this is a defendant who destroyed evidence. Why don't we hear from the other side, and you'll have some minutes for reply. Mr. Taxman. Thank you. May I please the Court? Would you like me to start, or is there an area you'd like to direct me to, to answer any questions, because I'm prepared to address the jury. Did you try the case? I did, Your Honor. When the scissors was used on the carrot, did it make a cut on both sides of the carrot, or only one? Only one side, Your Honor. It did not make a cut.  The scissors that cut the carrot in three places, twice on the bottom, flipped over once on the other side to show that a cut could be made on the carrot without going, as Justice Quinn, as you said, not necessarily touching both sides. And in fact, the cut was made on the carrot simply to show that scissors cut, the mark they would leave when they cut, and they would not have to cut on both sides. The argument advanced by the hospitals that a scissors would have had to have cut on both sides. Did the other side, did the hospital's attorneys know that you were going to use a carrot? When did they first realize that you had a carrot in your pocket? When I cross-examined Dr. Krauss, and I put Dr. Krauss on as an adverse witness. She was not a 213 witness that I had disclosed, and I used this as a demonstrative aid to explain. And there was an objection about that right from the beginning, was there not? Right. There was an objection. But then later, go ahead. Yes, I'm sorry. There was an objection on foundation, and the hospital's attorney said, we're not going to have a reenactment. And I said, that's not what I'm going to do. I'm going to lay a foundation to use it as a demonstrative aid to see if it aids the doctor in explaining her testimony to the jury. If it doesn't aid her right in the records, I will abandon it. And Judge McCarthy said, if you can lay that foundation, I'm going to let you do it. Well, he would have prepared her for it, though, right? Did Dr. Kempman, or was Dr. Kempman surprised she pulled out a carrot? It was Dr. Krauss. I'm sorry, Dr. Krauss. I believe that she was, because she looked at me, do you want me to cut the carrot? I said, yeah, just cut the carrot. And so she put three cuts on the carrot. And I said, before she cut it, I said, would that explain your testimony as to how these scissors cut? And the foundation also revealed that the scissors were used during C-section and in labor and delivery. So it was not exclusive to any moment in time. Our burden was only to show that a sharp instrument in the control of the defendants produced this injury. Who brought the scissors? Who brought it? The scissors. The scissors were brought in opening statement by Council for Women's Health, Dr. Krauss's corporation. So they were marked, I think, as Exhibit 6 or 9 and used throughout the trial, in opening statement, in cross-examining of the experts. And Dr. Krauss was one of our last witnesses in our case. We called her as an adverse witness. So I took the scissors that were there in evidence and had been used already in the case. I didn't bring them out brand new. And they said these are, she had said she had brought them from the hospital. They were used throughout the case up to that point by Women's Health. So I just took what I was given. It wasn't a coincidence. I had a snap in me. I was thinking, what could I possibly use to cut? One of the justices held up a pencil, I think. Now, Counselor, if you're suggesting you just happen to have a carrot in your pocket, don't do that. I'm sorry. No, I'm saying I didn't. I thought of that. We're not jurors. I brought it in and thought that this might work to help demonstrate that. And believe me, it wasn't a coincidence. And Dr. Krause and the Health Network were, they wanted to lay it on the hospital as well, correct? Well, as to whether they wanted to lay it on the hospital or not, they were. Well, they wanted to say it's not us. They were bad at it from the beginning. And let's sort of, you know, sort of back up. I mean, this medical record leading up to before the baby was born unequivocally shows, and you get confused with the ROAs and ROPs, that the baby was face down. So looking with the top of the head at mom's tummy. So her face was down. Most babies emerge from the world like that, and they twist as they come through the pelvis. This baby was face down without the hands in the surgical field by two separate doctors who did that assessment. And the delivery note dictated, showed that this baby at the time of birth had the hands out of the surgical field. But there was also a note saying that the baby was face up, and that's Dr. Simon's library. Dr. Simon said that note was incorrect. Well, she wouldn't go on record. We gave her the opportunity in her deposition and at trial. We said, are you sure? She said, you know what, it might be correct. Are you willing to go on record and change it? Go ahead and change it. She said, I wouldn't do that. I'm not going to change it. I'm not that certain that I would change it. So I argued that the jury shouldn't change it. It was physically impossible for the hands to be in the surgical field. And then she made all this stuff up that it was a baby. She literally did this in trial, like almost like a baby raising the roof. And in her deposition she did, like, one of these. She said the baby's fighting to get up. All of these things that were really outrageous and not documented anywhere. But it's counterintuitive because she's saying, Simon's saying, I cut her finger. Odds are I'm the one who did it. Well, she's saying, well, I did it. I think I did it. I might be confusing this with another case. I most likely had the scalpel. Maybe Dr. Krause had the scalpel. It was all over the board. And she never knew. Well, you've done a lot of medical malpractice work. And I've reviewed a lot of it in 14 years. I don't recall the last time I saw a doctor say, yeah, that is me. My bad. I'm going to cut the child's finger. I've never seen that. I haven't either. And in this case it was important to their defense. If she stepped up and said, I did it. It's my bad. Hey, I didn't violate the standard of care. That was the only way the case was defendable. And you had to make a lot of different changes throughout to have that actually work. But back to the carrot, the carrot cutting. Let's look at really what happened there. So I lay the foundation. The doctor cuts it, says it will help me explain the jury my testimony. We ask to publish it to the jury. The counsel for the hospital says, can I just take a look at it before you show it to the jury? There's no objection to my foundation laid for demonstrative aid to explain the testimony. Judge McCarthy certainly couldn't be accused of abusing his discretion where there's no objection. I object. It won't aid. The foundation isn't laid. Furthermore, the hospital cross-examines the doctor to advance their own position on the carrot cutting. And this is found at the. Oh, they kind of have to do that, don't they? I won't read it. It's in your brief. Okay. And it's in the brief. So it's in there. So why is it okay? The demonstration is okay because it's going to advance their theories. They want to advance the theory, well, it should be jagged. It's not the right cut. It cut both sides. You know, specifically using the carrot cutting demonstration to aid testimony to explain their theory. Well, once it's in, once you use it, they have to use it, don't they? As a practical matter. They might or might not. I've seen it done where at that point move for a mistrial. At that point say, I'm going to cross-examine. I'm not waiving my right to the objection to foundation which wasn't made. None of that's in the record. So if we're going to accuse Judge McCarthy of abusing his discretion, he should get an opportunity to say, okay, wait a minute, I'm not going to make you cross-examine. I'm going to strike this. You didn't have the foundation. And I don't think Judge McCarthy did that. He carefully waited and it was never brought to his attention that the foundation wasn't laid and this wasn't proper. Can you address Dr. Light's, your position on Dr. Light? Absolutely. And I think the court has hit the nail on the head. There were three points in his deposition, evidence deposition, where he discussed this partial laceration. And, again, what he said, that picture, I can't tell you the timing of the injury. And pardon this next gesture. He says, if it's like this, I can tell you that the tendon's ripped at that time. This tells me nothing about the timing. He said, then he explained fully about partial lacerations and the effect of disrupting what he said was, this is a disruption of the digital cascade. If the digital cascade's intact, a flexor tendon's there, this is what you're going to see. If it's not, you're going to see a disruption. He explained that fully. Dr. Kaplan, the neonatologist, was asked also, and, again, this is in my brief, I won't read you the whole thing, asked to explain that very same physiological anatomical fact. The hospital took that evidence from Dr. Light and Dr. Kaplan, and there was also testimony from Dr. Pensler about how accessory muscles could lead to controlling the digital cascade. All of that evidence was in, and then the argument was advanced. The hospital was not prohibited in any way from making the argument. They're saying, Justices, we were prejudiced. We didn't get to counter the argument on this picture. We didn't get to explain about the digital cascade. We didn't get to explain about partial lacerations. They did. That's at volume 11, page 17. It's 51 in the transcript itself, but there's a long argument about what Dr. Light said, and the finger being down, the hospital advanced it. There isn't any prejudice. So those are the arguments that they would have to say, Judge McCarthy abused his discretion. He left out things that handcuffed us. We couldn't make our arguments. It's not true. Why shouldn't we grant the remitter? You shouldn't grant the remitter because the jury and many of the things you asked counsel for the hospital are things that I would advance. At the end of the day, when any of us try and evaluate these cases, and I sit down with my clients and say, What's my case worth? And if I tell them what their case is worth, I'm lying. And I tell them, I'm lying. I can't tell you what your case is worth. I've got to see the evidence. I've got to look at every witness. I've got to look at your medical records. We've got to look at the permanency here. We've got to see what we're up against. Do they have an expert that's going to say something different? The medical evidence in this case, the disability evidence in this case, unrebutted. We put in all the evidence. There wasn't an expert saying we were wrong. It was limited in some way. Every medical witness, and there were four of them, permanent injury to a child, 81 years of the pain and suffering, the disability, the disfigurement. Let's address that. Will you concede that an award of damages is not an exact science? There's no formula for determining how much an injury is worth. You'll concede that. I think that's exactly what I was trying to say. You said it much better than I did. With that being said, was the award for disfigurement fair and reasonable when it exceeded your request by $300,000? Absolutely not. Because it's not an exact science. And, in fact, what we're doing every time we try a case, once we lose control of that case, when they say zero, they say taxmen, uh-uh, nothing, NG, or $1, do they get it wrong because I asked for more? I don't know what 12 people are going to evaluate it at. I know that if they give zero for disfigurement in this case, then this court or Judge McCarthy is going to say there was unrebutted evidence. They got it wrong. But when they give something and 12 of them agree on it, and the record is unrebutted on all of those things, how do we say they're wrong? I mean, we look at the standards. It shocked the judicial conscious. Well, again, I can go through, as I did in my brief, over and over and over again, all of the evidence, unrebutted, that the jury heard when they said for The hospital said $250 for disfigurement. The hospital never suggested a figure for anything else. And, Justice Neville, you said, well, you had to break them up. And counsel said, okay, well, $250 for each. That's the first time in the history of this case that the hospital or any defendant has ever suggested to anybody what this child should have been awarded for, for pain, for suffering, for the disfigurement. They left those blank, unrebutted, didn't give the jury any guidance, and now they're saying, well, the jury went crazy. They were stirred up by passion and prejudice. I submit they were stirred up by the unrebutted medical testimony of what the child went through and what the child, unrebutted, is going to go through for the rest of her life. And that's what stirred them up, so to speak, but in the guidance of the law, everybody knew this is a horrible injury from the beginning, all the doctors, horrible injury in a horrible place with, unfortunately, a horrible outcome. And I submit that the record supports exactly what the jury did, exactly what the jury did. And the other thing I'd note, and I think you've seen this in the briefs, the 750 number from the hospital comes from their post-trial motion. In the brief they filed in the court, they said, well, maybe no, maybe about 818 to 1.3. That's more fair and reasonable. I mean, it shows you that there's a sliding scale there that they can avail themselves to. There's a sliding scale on our end as well as to where the value will fall. And at the end of the day, Judge McCarthy said, I'm not going to substitute my judgment for what the jury did. I saw the evidence. The jury saw the evidence. They saw the pictures, the video, the medical evidence. They met the child. They heard what her parents had to say, heard what her grandmother had to say, heard how she's limited, how she suffers. And then they made their decision. Thank you, Mr. Tankman. Ms. Jennings, brief for five. I really don't have much to add, Your Honor, other than to point out that when Plaintiff is talking about, well, there was evidence that she was face down. Well, there was also evidence that she was face up. There was also evidence that a cut could have happened whether she was face up or face down. This was a closely balanced case on the evidence, which is why these evidentiary errors to us made a big difference. As far as failing to object, we objected when the scissors and the carrot were brought out of the foundation pointing out to the court, you know, it's not similar, it's not, you know, it's cutting the finger and cutting a carrot is not the same thing. What the judge said was, you know, if you lay a foundation that the scissors are similar, I'm letting it in. So that was the only foundation he required. What's wrong with that? And that's the foundation that was laid. Because we still don't know if those scissors were, you know, the sharpness of it, whether the way it cuts a carrot is the same because, you know, they talked about it being ragged. Did the hospital complain when Krause's counsel was using an opening statement? Did the hospital object to the scissors being in the courtroom right from the beginning when Krause's lawyer is arguing an opening with the scissors in his hand? Did the hospital say, oh, no, we don't know? No, they did not. Well, late in the game. But showing them these are scissors and showing them, and look how they cut a carrot. And it's just like they cut Sidney's finger. That we objected to because it was a recreation of an incident that supposedly took place. We don't even have any evidence that it was scissors that did it. That's what we objected to. I mean, to say you didn't object to the scissors being there. It's not the plaintiff's job in a recidivistic case to say here, here's other sharp objects. No, it is the plaintiff's case. It is the plaintiff's place to establish foundation. It's not mine to disprove a foundation. Plaintiff needed to lay their foundation at the time this experiment went forward in front of the jury, and he didn't do it. And we objected to it. Anything else? No, Your Honor. Thank you so much. Thank you. Thank you to the briefs, the arguments that will take this case under advisement.